Abraham N. Geller, J.
The question of the proper rate of interest to be directed to be paid in this condemnation proceeding raises fundamental issues of importance.
Section B15-28.0 of the Administrative Code of the City of New York provides that interest from date of vesting shall be paid by the city to the respective owners and section 3-a of the General Municipal Law provides that the rate of interest to be paid upon any judgment or accrued claim against a municipal corporation arising out of condemnation proceedings shall not exceed 4%. When the owners (claimants) urged on the hearing of objections that 6% was the minimum fair and reasonable rate from the respective dates of vesting for the original and supplemental takings herein, April 22, 1965 and November 1, 1965, to the date of payment, and requested the opportunity to present evidence, the court set the matter down for presentation of proof, pointing out that relevant circumstances during the past several years warranted re-examination at this time of the question of interest (N. Y. L. J., May 7, 1968, p. 17, col. 8).
At the outset, and throughout this discussion, it is important to keep in mind that both our Federal and State Constitutions mandate the payment of ‘ ‘ just compensation ’ ’ when private property is taken for public use, compelling, in effect, a sale by the owner to the government or an agency thereof (U. S. Const., 5th Amdt.; N. Y. Const., art. I, § 7).
*158 The constitutional requirement of “ just compensation” necessarily includes the addition of a proper rate of interest, since the owner is entitled to “ some sum in addition to the bare value of the property at the date of taking for the delay in making payment, so that the compensation may be just ” (Matter of City of New York [Bronx Riv. Parkway], 284 N. Y. 48, 54, affd. 313 U. S. 540).
That interest as an integral part of constitutional ‘ ‘ just compensation ” is, when appropriately raised, a matter for judicial determination, has been long since settled. In Monongahela Nav. Co. v. United States (148 U. S. 312, 327), the court stated: “ It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule for compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry. ’ ’
In Seaboard Airline Ry. v. United States (261 U. S. 299, 306) it said: “It is obvious that the owner’s right to just compensation cannot be made to depend upon state statutory provisions. ” And in the Appellate Division, in Matter of City of New York (Bronx Riv. Parkway) it was explicitly pointed out (259 App. Div. 552, 555): “ The statutory rate of interest is not controlling if some other rate is required to meet the constitutional requirement for just compensation, ”
The 6% legal rate of interest prescribed by section 370 of the General Business Law (now General Obligations Law, § 5-501) was generally applicable to all transactions until 1939, when, as the product of the depression era, three statutes were enacted to prescribe a maximum rate of 4% on judgments and accrued claims against the State (State Finance Law, § 16), against municipal corporations (General Municipal Law, § 3-a), and against public corporations (L. 1939, ch. 585). Section 3-a of the General Municipal Law was amended in 1956 to reduce that rate to 3% except as to claims arising out of condemnation proceedings and for wrongful death, where the 4% rate was retained.
In Matter of City of New York (Bronx Riv. Parkway) decided in 1940, claimants challenged the constitutionality of section 3-a of the General Municipal Law. The court held (284 N. Y. 48, 55): (1) “ Claimants’ contention that interest at the rate of four per centum is so unreasonably low as to deprive them of just compensation is not supported by any evidence, and is contrary to common experience (2) The fact that the statute provides a lower interest rate for obligations of municipal *159 corporations than the general interest rate does not constitute a denial of the equal protection of the laws to claimants. The Legislature did not indulge “in an unreasonable and palpably arbitrary classification when it provided for this differentiation. * * * The sovereign and public character of the favored debtors and the lower rates of interest usually applicable on their borrowings may well form a basis for differentiation. The classification cannot be deemed unreasonable ” (p. 54). Interest at the rate of 6% was directed to be paid from the date title was taken by the city to July 1, 1939, and at the rate of 4% thereafter to date of payment.
It should be noted that at that time Federal, State and municipal bonds were paying from 1%% to 3%, savings banks 2%, and mortgages about 4%.
The statute was attacked again in 1959 in the Lincoln Square condemnation. The court stated (Matter of City of New York [Maxwell], 15 A D 2d 153, 179, affd. 16 N Y 2d 497): “ And since the ascertainment of just compensation is a judicial question * * * the specific provision in section 3-a of the General Municipal Law does not foreclose consideration of claimants’ contentions as to what constitutes just compensation”.
But the court found that, despite some rise in interest rates generally since 1939, such proof would not overcome the ‘ ‘ presumptive ” applicability of section 3-a; that the 4% interest rate, “ common knowledge tells us reflects a reasonable balance between return and safety. The objective of courts in eminent domain proceedings is to do substantial justice * * just, not merely to the individual whose property is taken, but to the public which is to pay for it ” (pp. 181-182). The court held (p. 182) that “ the 4% rate * * * seems to us a median which cannot seriously be questioned as substantially just ”.
As to the ‘ ‘ favored debtors ’ ’ argument, the court stated (p. 182): “ The record reveals no offer of proof that the 4% rate unduly favors them. If a municipality expects to pay an award with funds in hand, presumably those funds yield it an income during the period of delay in payment; and if it expects to pay with funds to be borrowed, it saves interest of course on the deferred borrowing. Claimants do not even hint that the municipality, which is the condemnor herein, procured benefits of this nature at rates exceeding 4% per annum ”.
It is, of course, a matter of common knowledge and experience that interest rates have been rising since then and during the last two years have reached a level which represents a complete swing of the pendulum from those prevailing in the depression era. The bank prime rate to the largest corporations was *160 increased shortly before August, 1966 to 5%% and is presently 6%%. Bank loans to others are based on the prime rates, ranging from V2 to V/zfo more, so that the interest rate in the money market has been 6% to 714% shortly before August, 1966 and is presently 7 to 8%. The State’s interest rate ceiling on bank loans to individuals has now been increased from 6 to 7%%. Real estate mortgage money, including F. H. A. and Veterans’ Administration mortgages, has for some time been unobtainable at even 6%. The interest rate on home loans insured or guaranteed by the F. H. A. or the Veterans’ Administration is now 6.75%, with the borrower paying an additional %% to the Government.
Sound corporate bonds have been yielding about 7%. New York savings bank interest has since July, 1966 been 5% compounded quarterly. Federal Government issues have been paying 6%. The yield on the city’s tax-exempt bonds in August, 1966 was 4.6518% and in March, 1968 was 4.9203%. In 1968, passed on home rule request, the Legislature amended the Local Finance Law to authorize the City of New York to sell its tax-exempt bonds and notes at a rate not to exceed 6%. For the fiscal year 1966-1967, the City of New York obtained an average yield on its long-term investments of 5.45%.
It is now abundantly clear that interest at the rate of 4% is “ so unreasonably low” as to deprive claimants of just compensation, since enforced borrowing during the long period of delay before payment in order to operate businesses compelled to remove to new quarters or to make compensatory investments costs them 7 to 8% against the 4% they receive. And, “ common knowledge tells us ”, the 4% rate has for some time not reflected a reasonable balance between return and safety. Moreover, since the city has been earning 5.45% on its investments and paying 4.7 to 4.9% tax-exempt interest on its borrowings, with higher rates anticipated, it is to its profit to pay only 4% interest on condemnation awards, whether it pays the awards from funds on hand yielding it an income during the period of delay in payment or from funds to be borrowed with resultant saving of interest on the deferred borrowing. Indeed, while the city was authorized by section B 15-29.0 of the Administrative Code to make advance payments not exceeding 75% of its appraisal, increased to 85% in May, 1966, its advance payments to these claimants under the 75% authorization averaged only about 65%, and under the 85% authorization only about 75%, which actually amounted to about 45 to 60% of the ultimate awards.
It is obvious that the objective of courts in eminent domain proceedings to do “ substantial justice ’ ’ to the individual *161 whose property is taken and to the public which must pay for it by providing a ‘1 median ’ ’ rate of interest for the delay in payment has for at least the last two years not been fulfilled by the unrealistic and outmoded 4% rate. During these past two years and for the immediate future, it is evident that 6% would represent a fair median rate as between the city’s yield on investments and interest payable on borrowings and claimants’ yield on corporate bonds, savings bank deposits, etc., and rate of interest payable on substitutionary loans. The Federal Government pays 6% interest on a condemnation award (U. S. Code, tit. 40, § 258a). The 4% rate in condemnation proceedings has since at least August, 1966 ‘‘ unduly ’ ’ favored the City of New York.
The adequacy of New York State’s laws on property condemnation was a matter of concern several years ago and the Governor created a Committee on Land Acquisition Law and Procedures, which submitted a comprehensive report in February 1966. On the subject of “ Unrealistic Interest Bates ”, the report stated (p. 162) :
1 ‘ Intertwined as a part of the general damage problem, but actually a subject which deserves special consideration on its own, is the question of interest payable by the State as an item of damage.
“ At the present time the statutory rate of interest established in the State Finance Law payable upon claims for appropriated land is 4%. The rate is outmoded and should be replaced by an interest rate far more in keeping with today’s financial facts of life, particularly where a claimant has to wait a considerable time before he obtains the value of the property appropriated, or where he has lost income-producing property. The money market calls for at least 6%. The Federal Government pays 6%, and there appears to be no justification for the State to pay less interest than that paid by the United States.”
The report then discussed, in particular, the problem of the owner of business property, forced to negotiate a loan at not less than 6% on the strength of the payment to be received from the State, with consequent substantial out-of-pocket expense in interest ‘ ‘ that is nowise recoverable by the property owner ” (p. 162). It recommended that the State interest rate be increased to “ ameliorate the financial burdens it has itself created for its citizens ” (p. 163).
Although these facts and reasons were equally applicable to all condemnation proceedings by the State or any of its subdivisions or agencies, the 1966 Legislature amended only State Finance Law (§ 16, eff. Aug. 1, 1966) to increase the maximum *162 rate of interest in State condemnation proceedings to 6%, while leaving untouched at the 4% rate of section 3-a of the General Municipal Law as to condemnations by the municipalities of the State, and chapter 585 of the Laws of 1939, as to condemnations by public corporations of the State. Nor did the 1967 and 1968 Legislatures act on bills offered to amend those provisions, but the 1968 session did provide for a maximum rate of interest of 6% with regard to condemnations of the New York State Urban Development Corporation, created by chapter 174 of the Laws of 1968 (eff. April 10, 1968).
There can be no question that this differentiation represents “an unreasonable and palpably improper classification” and constitutes a denial to claimants of the constitutional right to equal treatment of the laws. As to the condemnor, it may be noted that, if any differentiation exists, it would favor a lower rate of interest by the State than the city, since its tax-exempt bonds are selling at a lower rate of interest than the city’s. But the matter of equal treatment of the laws is concerned with the treatment of the owners whose properties are taken. Without any possible basis, either on logical or practical grounds, the 1966 legislation established a differentiation in the classes of owners receiving 4% or 6% interest on delayed payments of constitutionally-required “ just compensation ”. Thus, despite the fact that the Constitution guarantees the same measure of just compensation to all owners of property, despite the fact that the power of eminent domain as to all property in the State is derived from and through the State, and despite the fact that the power to provide the necessary funds or the means by which payment shall be made is vested in the Legislature, neighboring properties condemned by different entities of the State have not been treated equally. Thus, in Harlem, where the State has condemned property for a new State office building, the owners are entitled to 6% interest; while in this downtown Manhattan Civic Center area interest is limited by statute to 4%. The August 1, 1966, differentiation and classification must be held to be wholly arbitrary. The unfairness of the 4% rate is also pointed up by the fact that, across the street, the owners of property condemned for Federal projects receive 6%.
These factually compelling and basic constitutional considerations inevitably require a judicial determination that just compensation to the claimants in this condemnation proceeding must include interest at 4% from the respective vesting dates to August 1, 1966, but at 6% from August 1, 1966 to date of payment.
*163 Turning now to the objections to the tentative awards, all objections to the principal amount of the awards, except as to those herein modified, are overruled.
Damage Parcels 7 and 8 — On review of the record, the court finds that its rental value, even on a single-tenancy operation, for the ground floor and basement of Damage Parcel 7, the fireproof building, is inadequate and should be increased from $1.75 per square foot to $2 and from $.65 to $.75, respectively, thus resulting in an increase of gross rental value by $685, which, after deducting 5% for vacancies, results in an increase, after capitalization, in building value, of $5,500. The award, therefore, is modified as follows: Land $109,000, building $51,000, total $160,000.
Damage Parcel 10 — Here, also, on review the court finds that its finding of $3.25 per square foot for ground floor, basement and subbasement, is inadequate and should be increased to $3.50, thus increasing gross rental value by about $500, which, after deduction for vacancies and capitalization, results in an increase in building value of $3,750. The award, therefore, is modified as follows: Land $54,000, building $21,250, total $75,250.
Damage Parcel 17, .18, 19 — The court finds that the 13% capitalization rate here adopted failed to take account of the building alterations made within the period of 10 years prior to condemnation. Applying the more reasonable rate of 12% produces a building value of $166,500. The award, therefore, is modified as follows: Land $270,500, building $167,500, total $438,000.