OPINION OF THE COURT
Susan Phillips Read, J.
By a decision filed on November 16, 1998, retired Judge James P. Kang found the State of New York (defendant or the State) 80% liable for the catastrophic physical injuries sustained by Melody Auer when the automobile in which she was a passenger crashed into a tree on Route 32 in the Town of Saugerties. The other tortfeasor was the car’s driver. In a subsequent decision filed on December 30, 1999, Judge King determined that Melody Auer’s damages totaled $18,952,486. This decision addresses the rate(s) of interest to be applied pursuant to CPLR 5002 and 5003.
The State argues that the statutory maximum 9% interest rate under section 16 of the State Finance Law does not reflect market conditions during the time period relevant to this claim, and presses the court to exercise its discretion to set a lower rate as' the Court of Appeals in Rodriguez v New York City Hous. Auth. (91 NY2d 76) made clear that it may. In support of its position, defendant has submitted the affidavit of its expert economist, Kevin Decker, who opines that the presumptively reasonable 9% statutory interest rate is unreasonably high, and that an interest rate of 5% to 5.25% a blended rate derived from the interest rates payable on a series of three-month Treasury bills offered between November 1998 (the date of the liability decision on this claim) and April 2000, leavened by the interest rate on a 30-year Treasury bond available in November 1998, represents a reasonable interest rate to compensate claimants for their lost purchasing or investment opportunities during this interval.
Contrariwise, claimants urge the court to decline to exercise its discretion to deviate from the presumptively reasonable 9% statutory interest rate. In support of their position, claimants advance the affidavits of Thomas R. Kershner, their expert economist, and James F. McDonald, the Chief Investment Officer of the Hudson River Bank and Trust. Both Mr. Kershner and Mr. McDonald opine that a reasonably prudent investor with a diversified portfolio of stocks and bonds would have achieved a rate of return far exceeding 9% since November 1998.
Since the Court of Appeals decision in Rodriguez (supra), a few trial courts have exercised their discretion to set an inter *256 est rate below 9% the presumptively reasonable statutory rate for obligations of the State of New York and various other public entities: see, e.g., Carl v Daniels (Sup Ct, Bronx County, Aug. 25, 1998, Giamboi, J., index No. 14781/91 [trial court sets an interest rate of 7% on damages awarded by jury verdict against the City of New York and the New York City Health and Hospitals Corporation]); Murnane Assocs. v Harrison Garage Parking Corp. (Sup Ct, Onondaga County, Nov. 22, 1998, Elliott, J., index No. 93-3565 [trial court sets an interest rate of 6% on a judgment pursuant to CPLR 5001 against the City of Syracuse], affd 269 AD2d 854 [Fourth Department concludes that trial court did not abuse its discretion in awarding prejudgment interest at a rate of 6% citing General Municipal Law § 3-a (1) and Rodriguez v New York City Hous. Auth.], lv denied 95 NY2d 751); see also, Anderson, 9% Still Usual Rate of Interest for City (NYLJ, Sept. 29, 1998, at 1, col 5 [referring to certain trial court rulings in which Judges had set the interest rate lower than 9% in cases involving the City of New York, including two in which the courts are reported to have pegged the interest rate to the yield of one-year Treasury securities]). This court has located no published or unpublished opinion, however, in which a post -Rodriguez trial court exercising its discretion to set an interest rate below 9% discussed the evidence or its reasoning.
Most post -Rodriguez courts have continued to set interest on awards against the State or other public entities at 9% — which is, after all, the presumptively reasonable statutory rate — but again, usually without explanation. In many of these instances, the defendant for whatever reason may have elected not to contest the presumption, as, for example, happened in Wielgosz v State of New York (Ct Cl, filed Feb. 4, 2000, Read, J., claim No. 91798), a decision remarked upon by claimants’ counsel in which this court recently awarded 9% interest without discussion.
In several other instances, though, the defendant contested the presumption and the trial court wrote a decision evaluating the parties’ evidence and setting forth its rationale for declining to deviate from the presumptively reasonable 9% statutory interest rate. To a considerable measure, evidence and arguments similar to those presented by claimants here have swayed these trial courts; specifically, a number of courts have reasoned that in light of the bull market of the last nearly two decades, any prudent investor with a diversified portfolio of stocks and bonds would have likely achieved a rate of return *257 far exceeding 9% during whatever time period was relevant in the particular case; and — as a corollary proposition to countervail the alternative to the statutory rate most frequently put forward by defendants — that no prudent investor would invest solely in Treasury bills (see, e.g., Matter of New York State Urban Dev. Corp., 176 Misc 2d 772; Pay v State of New York, 176 Misc 2d 540; Molinari v City of New York, 176 Misc 2d 523; Phillips v State of New York, Ct Cl, filed Jan. 11, 1999, Lane, J., claim No. 87572; Scorza v New York State Thruway Auth., Ct Cl, filed Mar. 31, 1999, Patti, J., claim No. 88441; Morrisseau v State of New York, Ct Cl, filed June 12, 1998, Collins, J., claim No. 79428; Washington v State of New York, Ct Cl, filed Mar. 12, 1999, Corbett, J., claim No. 84421). Other circumstances either considered or identified by trial courts as relevant to the decision whether to set the interest rate lower than 9% in a contested case include the likely investment strategy of the particular injured party (Frontier Ins. Co. v State of New York, Ct Cl, filed Sept. 10, 1998, King, J., claim No. 90715); the time elapsed since the liability decision (Pay v State of New York, 176 Misc 2d 540, supra); and the comparative fault of the parties and the statutory interest rate applicable to a codefendant (Sassoonian v City of New York, 178 Misc 2d 660, affd 261 AD2d 319, 320 [First Department concludes that trial court did not improvidently exercise its discretion in awarding 9% interest on a judgment entered after verdict “since no compelling reason ha(d) been set forth to warrant deviation from the statutory rate which is presumptively fair and reasonable” (citing Rodriguez v New York City Hous. Auth., supra)]).
Professor David D. Siegel has observed that the Court of Appeals in Rodriguez (supra) furnished no “guideposts” for a trial court’s determination of the proper interest rate and imposed no “hasty fetter” from above on the selection of a proper standard (69 Siegel’s Practice Review, The Problem of the Interest Rate Applicable Against Government Entities Under the Rodriguez Case, at 4 [Mar. 1998]). The way signaled by Rodriguez lies not entirely trackless, though: in particular, the Court (1) declined to cabin the lower court’s discretion by adopting the proffered[1] or any other specific method or reference for calculating interest; (2) noted that the statutory 9% interest rate was *258 presumptively fair and reasonable, citing and quoting from City of Buffalo v Clement Co. (28 NY2d 241), a key precedent in condemnation case law in New York; and (3) remarked that the fact that an interest computation other than the statutory rate might also be “reasonable” did not mandate its selection by a trial court in an exercise of discretion.
Thus Rodriguez (supra) endorses an award of interest at the presumptively reasonable 9% statutory interest rate unless the defendant in the particular case overcomes the presumption with evidence sufficient to persuade the trial court that the statutory rate is unreasonably high and, if the defendant makes such a showing, confirms the trial court’s discretion to award interest at a lower rate (compare, Metropolitan Transp. Auth. v American Pen Corp., 253 AD2d 366 [a condemnor challenging the reasonableness of the maximum applicable 9% statutory interest rate bears the burden of proving that the statutory rate is unreasonably high and that a lower rate would be constitutionally sufficient], affd on other grounds 94 NY2d 154). On such matters as the weight of evidence sufficient to oust the presumption or how great a disparity renders the statutory interest rate unreasonably high or how to fix or select a lower interest rate, Rodriguez affords the trial court infinite latitude. Whether Rodriguez leaves open to an equal degree the kinds of circumstances or evidence relevant for the trial court to consider when the presumption is contested is less certain — at least to this particular trial court — particularly in view of the condemnation case law pre-existing and adverted to in Rodriguez,[2] as discussed below.
A. Discussion
In 1939 the Legislature amended the General Municipal, Law to add a new section 3-a, effective July 1, 1939, which specified a rate of interest not to exceed 4% per year on municipal obligations at a time when the general interest rate in the State was 6% per year (L 1939, ch 594). In People ex rel. *259 Emigrant Indus. Sav. Bank v Sexton (284 NY 57, 61), a tax certiorari case cited and quoted in Rodriguez (supra), the Court held that the 1939 statute was prospective only in effect and did not delegate legislative power because “[a] limit merely is imposed. There can be no doubt that the fixing of the rate of interest, or a limitation of the rate, is legislative in character. This circumstance is, however, without significance. The statute mandates no particular rate. Courts have long exercised authority to determine in accordance with legal rules and principles whether or not interest should be directed to be paid and the rate thereof. [Citations omitted.] This power is by this statute restricted in one particular only, a maximum is imposed.”
In Matter of City of New York (Bronx Riv. Parkway) (284 NY 48, affd sub nom. A. F. & G. Realty Corp. v City of New York, 313 US 540), a condemnation case decided the same day, the Court of Appeals held the 1939 statute constitutional and applicable to a municipality in a condemnation proceeding.[3] Further, “compensation, when not paid coincidentally with the taking of the property, must include some sum in addition to the bare value of the property at the date of taking for the delay in making payment, so that the compensation may be just” and “[i]n the absence of evidence as to what such additional sum should be, interest, as provided by law, meets the constitutional requirement” (supra, at 54).
The claimants had been awarded 6% interest from the date the City took title until July 1, 1939, the effective date of General Municipal Law § 3-a, and 4% interest thereafter until payment. The claimants protested that interest at the rate of 4% was so unreasonably low as to deprive them of just compensation, but the Court rejected their contention as “not supported by any evidence, and * * * contrary to common experience” (Matter of City of New York [Bronx Riv. Parkway], 248 NY, supra, at 55), thus affirming the Appellate Division (see, Matter of City of New York [Bronx Riv. Parkway], 259 App Div 552 [the statutory interest rate was not controlling if some other rate was required for just compensation, but the maximum legal rate was prima facie the proper rate and in this proceeding no contrary proof was offered]).
The Legislature amended section 3-a of the General Municipal Law to increase the maximum rate of interest payable on *260 condemnation awards from 4% to 6% per year in 1969 (see, L 1969, ch 1102, eff July 25, 1969), nearly three years after amending section 16 of the State Finance Law to this effect. This temporary difference in rates coupled with changes in prevailing interest rates in the economy prompted claimants to contest the constitutional adequacy of a 4% interest rate in municipal condemnation proceedings.
In Matter of City of New York (New Mun. Bldg.) (57 Misc 2d 156, affd sub nom. Matter of City of New York [Manhattan Civic Ctr. Area], 32 AD2d 530, affd 27 NY2d 518), the claimants presented the trial court with evidence to establish that interest rates in the metropolitan New York area had generally exceeded 6% from the date of the takings in 1965.[4] The trial court also noted that the Federal Government paid 6% interest on a condemnation award as had the State since August 1, 1966, and, in fact, held that the disparity in State and municipal interest rates in condemnation proceedings denied claimants their constitutional right to equal protection of the laws. He therefore awarded claimants interest at 4% (the applicable statutory interest rate) from the vesting dates until August 1, 1966 (the effective date of the amendment to section 16 of the State Finance Law), and at 6% thereafter until the date of payment.
Next, in City of Buffalo v Clement Co. (28 NY2d 241, 266, supra), the condemnation case cited and quoted in Rodriguez (supra), the Court of Appeals discussed the relevance of the statutory interest rate to an analysis of just compensation: “[W]e have consistently viewed the statutory rate as presumptively reasonable, and in the absence of evidence sufficient to rebut that presumption capable of being applied the legal rate of interest merely fixes a fair measure or a prima facie measure of the proper rate to afford just compensation. In the absence of proof that some other legal rate must be paid to afford such compensation, the legal rate as it existed during the period elapsed satisfies the constitutional requirement. The question thus becomes whether the evidence introduced by [claimant] in the instant case is sufficient to rebut the statutory presumption; and as we are presented with affirmed findings of fact, tending to show that the rate of interest was not *261 unreasonable, and as these findings are supported by substantial evidence, we are jurisdictionally precluded from reviewing the same (Cohen and Karger, Powers of the New York Court of Appeals, pp. 476-480).”
In Matter of County of Nassau (Eveandra Enters.) (42 NY2d 849, 850-851), the Court of Appeals was again unimpressed by the evidentiary showing made by a claimant seeking to demonstrate the constitutional infirmity of a prejudgment interest rate of 6% in a condemnation proceeding: “The appropriate interest rate is not measured by particular fluctuations in categories of interest rates for public or private securities or lending. So long as the statutory rate constitutes a judicially acceptable, fair return for the deprivation of the use of that property or the money equivalent of that use, either or in combination, the statutory rate should be considered proper” (emphasis added).
The Court of Appeals found otherwise, however, in Matter of City of New York (Brookfield Refrig. Corp.) (58 NY2d 532), a case considered to resemble Matter of City of New York (New Mun. Bldg.) (57 Misc 2d 156, affd sub nom. Matter of City of New York [Manhattan Civic Ctr. Area], 32 AD2d 530, affd 27 NY2d 518, supra), since both presented affirmed findings of fact supporting claimants’ challenges. While noting that it had “frequently rejected challenges to the applicable statutory rate of interest * * * because claimants failed to demonstrate that the rate was so ‘unreasonably low’ that it deprived them of just compensation” in cases where “there were only slight variations between the statutory rate and the prevailing interest rates for public and private securities” (Matter of City of New York [Brookfield Refrig. Corp.], supra, at 537-538 [emphasis added]), the Court in Brookfield pointed to affirmed findings indicating that “the 6% statutory rate of interest was inadequate to afford just compensation during the years 1978-1981. At that time, average interest rates on stable investments, such as medium term public securities, ranged between 8.3% in 1978 and 12.5% in 1981 * * * Similarly, the evidence supports the determination that claimant had failed to rebut the reasonableness of the statutory rate for the years 1972-1977, when interest rates fluctuated around 6%.” (Supra, at 538 [emphasis added], cited with approval in Adventurers Whitestone Corp. v City of New York, 65 NY2d 83, 87 [“The amount of interest necessary to bring the payment into accord with the constitutional requirement is a judicial question, although the interest rate fixed by the Legislature will be deemed presumptively *262 reasonable unless the claimant rebuts the presumption with evidence of prevailing market rates establishing that the statutory rate is so ‘unreasonably low’ as not to constitute just compensation”]).
To summarize, when called upon to determine whether the presumptively reasonable statutory interest rate adequately compensates for the delay in payment in condemnation cases, New York’s courts have traditionally done so by comparing the statutory rate to actual market interest rates for the relevant time.[5] This court adopts the same approach and considers prevailing market interest rates at the time of the decision and *263 until entry of judgment (CPLR 5002), and at entry of judgment and until payment (CPLR 5003) to be the relevant evidentiary touchstone for evaluating the reasonableness of the statutory interest rate in a contested case and determining any alternative rate of interest.
B. Findings
Interest is “the cost of having the use of another person’s money” (Love v State of New York, 78 NY2d 540, 544, citing Siegel, NY Prac § 411, at 623 [2d ed]) or “the return paid to those who lend money” (Samuelson and Nordhaus, Economics, at 748 [16th ed 1998] [hereafter Economics]); and an interest rate is “the price of money” (id., at 469). Put colloquially, a dollar today is worth more than a dollar tomorrow, and postdecision and postjudgment interest compensate a successful litigant for this loss of value and for the loss of access and use of the damages award during the interval of delay between verdict or decision and payment.
The three basic components of an interest rate have been described as (1) the opportunity cost of capital (net of any risk of loss and of any expectation of inflation or deflation); (2) the anticipated inflation rate over the period of time until the loan is paid off; and (3) the risk premium necessary to compensate the investor for the risk of loss of the funds loaned (see, Posner, Economic Analysis of Law § 6.11, at 212-213 [5th ed]; see also, Economics, op. cit., at 469-471).
The State asks the court to award interest on this claim at a rate of 5% to 5.25%, which reflects the interest rates on certain Treasury securities offered since the date of decision. Since Treasury securities are virtually riskless because backed by the full faith, credit and taxing powers of the United States Government, the State, in effect, seeks an interest rate devoid of the risk premium component.
Claimants, on the other hand, shun analysis or discussion of market interest rates altogether. They urge the court to award interest at the presumptively reasonable statutory maximum rate of 9% because this rate was exceeded by the rate of return on a diversified portfolio of stocks and bonds constructed in hindsight; and/or the average annual compounded total rate of return on the Standard & Poor’s Index; and/or the rate of return for an “average” mutual fund for the relevant time.
The State ripostes that claimants can hardly expect a damages award to reflect equity rates of returns without having incurred the significant risk of loss of funds inherent in any *264 equity investment — even in a bull market — and the court agrees. While claimants imply that a “riskless” interest rate necessarily undercompensates them, the court notes that the purposes to be served by postdecision and postjudgment interest — to compensate a successful litigant for the loss of value (i.e., the inflation component of an interest rate) and the loss of access and use of the damages award (i.e., the opportunity cost component of an interest rate) during the interval of delay between verdict or decision and payment — do not imply a premium for risks, in fact, not taken. In any event, the key issue for the court to decide is whether the State has provided sufficient evidence to establish that the presumptively reasonable 9% statutory interest rate is unreasonably high in relation to prevailing market interest rates for the relevant time.
As Professors Samuelson and Nordhaus have remarked, while “[t]extbooks often speak of ‘the interest rate,’ * * * in fact today’s complex financial system has a vast array of interest rates” (Economics, op. cit., at 469 [emphasis in original]). Nevertheless, interest rates on Treasury securities are routinely characterized as the “benchmark” interest rates throughout the United States economy and in international capital markets as well (see, e.g., Fabozzi, The Handbook of Fixed Income Securities, at 149 [5th ed 1997]) because other major categories of interest rates rise and fall in concert with them. This phenomenon is graphically illustrated by Professors Samuelson and Nordhaus (see, Economics, op. cit., figure 25-2, at 470), and leads them to select the interest rate on short-term Treasury securities, such as the 90-day bill rate, as the indicium of the general level of interest rates in the economy (Economics, op. cit., at 470).
The State’s expert likewise utilizes the interest rates on Treasury securities as a proxy for prevailing market interest rates and opines that in the interval between November 1998 (the date of the liability decision) and the date of his affidavit (Apr. 2000) a series of three-month (i.e., 90-day) Treasury bills would have earned an average annual yield of 4.91% and a 30-year Treasury bond would have yielded 5.25%.[6] The court also takes judicial notice that since November 1998 the Treasury *265 Department, Bureau of the Public Debt, has held 19 auctions for 52-week Treasury bills, and that the coupon issue yield equivalent of the average accepted auction price at these auctions, when averaged, yields 5.23%.[7]
Based on the foregoing, the court finds that (1) the interest rates for Treasury bills (i.e., Treasury securities issued with maturity dates of one year or less) reasonably reflect prevailing market interest rates for the interval since November 1998 as well as currently; (2) the consistent several percentage point disparity between the statutory 9% interest rate and these rates over this interval as well as currently amounts to more than “slight variations” or “fluctuat[ions] around” the statutory rate (see, Matter of City of New York [Brookfield Refrig. Corp.], 58 NY2d, supra, at 538) and renders the presumptively reasonable 9% statutory interest rate unreasonably high; (3) an interest rate of 5.23% which falls within the range of interest rates *266 supported by the State’s expert and also reflects an average of results of auctions for 52-week Treasury bills during this interval, represents a fair and reasonable postdecision (CPLR 5002) interest rate to apply pursuant to State Finance Law § 16; and (4) an interest rate equal to the average of the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price at the June 1, 2000 auction of 52-week Treasury bills (6.375%) and all succeeding auctions up to and including the last auction settled immediately prior to payment of the judgment (rounded to the nearest hundredth of a percentage point), represents a fair and reasonable postjudgment (CPLR 5003) interest rate to apply pursuant to State Finance Law § 16.
[Portions of opinion omitted for purposes of publication.]

. Specifically, the Court did not adopt defendant-appellant New York City Housing Authority’s reasoning that the interest rate “ ‘should be based on the assumption that a reasonable pláintiff would have placed the verdict or judgment amount in a relatively safe investment, such as a Treasury se *258 curity” ” (Rodriguez v New York City Hous. Auth., supra, at 80-81, quoting defendant-appellant’s brief, at 12). Defendant-appellant had proposed an interest rate of 5.35% somewhat vaguely described as “the average 52-week Treasury Bill rate established by the market for the 12-month period which ended on May 18, 1995 [the date of the verdict herein]” (defendant-appellant’s brief, at 3).

. For an informative historical overview of pre-Rodriguez condemnation case law addressing the prejudgment interest rate, see Goldstein and Gold-stein, The Right to Interest, and to How Much, NYLJ, Feb. 25, 1998, at 3, col 1.

. As first enacted, General Municipal Law § 3-a did not make express reference to condemnation claims (see, L 1939, ch 594).

. The trial court mentioned the bank prime rate and the interest rates on bank loans, home loans, corporate bonds, certificates of deposit, Treasury securities, New York City tax-exempt bonds and notes and New York City’s yield on its investments (Matter of City of New York [New Mun. Bldg.], supra, at 159-160).

. Federal courts have likewise historically looked to market interest rates when setting the rate of prejudgment interest in eminent domain cases (see, e.g., Annotation, Method of Determining Rate of Interest Allowed on Award to Owner of Property Taken By United States in Eminent Domain Proceeding, 56 ALR Fed 477 [statutory interest rate is not a ceiling and Federal courts follow one of three general approaches to establish the interest rate in an eminent domain proceeding; i.e., they examine (1) interest rates on good quality corporate bonds; or (2) interest rates of government securities; or (3) a mixture of corporate bond rates, government security rates and various bank interest rates, such as the prime rate and rates on certificates of deposit]). In Matter of Urban Dev. Corp. (176 Misc 2d 772, 775, supra), the only published post -Rodriguez condemnation decision found by the court in which a trial court provides a rationale for not deviating from the presumptively reasonable 9% statutory interest rate, the Judge characterized “the universe of voluntary investment choices” since the taking at issue as “vast,” noting a 61% average rate of return over the relevant time period from a portfolio of stocks, bonds and cash allocated as recommended by 14 major Wall Street brokerage houses; and thus he concluded that the 9% rate was not unreasonable “[considering the range of investment choices” foregone by claimants. In so doing, the trial court cited Miller v United States (620 F2d 812) for the proposition that the government should bear the risk of fluctuations in interest rates; however, the appeals court in Miller made this statement in the context of explaining that the Trial Judge had erred by setting an interest rate based solely on economic circumstances prevailing at the time of the taking rather than throughout the years between the taking and payment; and the appeals court consequently fixed the interest rate based on an interest rate index of corporate bonds for the relevant time periods — not based on the rate of return of a portfolio of stocks, bonds and cash. Similarly, while the trial court in Matter of Urban Dev. Corp. cited United States v 429.59 Acres of Land (612 F2d 459) for the proposition that “[w]hile the rate of return should be what a prudent investor would receive on investments, it is not prudent to accept the lowest possible return for the least possible risk, if one can receive a better return for a reasonable amount of risk” (Matter of Urban Dev. Corp., 176 Misc 2d 772, 776, supra), the appeals court in 429.59 Acres of Land affirmed an award of interest at a rate based on averaging the interest rates for six-month Treasury bills, four- to six-month prime commercial paper, 90-day bankers acceptances and six-month bank certificates of deposit during the relevant time period— again, not based on the rate of return of a portfolio of stocks, bonds and cash.

. The Federal Reserve maintains historical and current interest rate information for selected instruments on its web site at http:// www.federalreserve.gov/releases/H15/data.htm, which the court has also reviewed. The Federal Reserve, for example, has posted historical interest rate information for calendar year 1999 for the following non-United States Government fixed income securities (among others): three-month commercial *265 paper (nonfinancial), 5.18%; three-month commercial paper (financial), 5.22%; three-month bankers acceptances (top rated), 5.24%; six-month bankers acceptances (top-rated), 5.30%; Moody’s seasoned corporate bonds (AAA rating), 7.05%; and Moody’s corporate bonds (BAA rating), 7.88%.

. Since 1982, Federal law has required postjudgment interest in most civil actions in Federal court to be set at “a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment” (see, 28 USC § 1961 [a]). This rate is computed daily to the date of payment and compounded annually. The rate is not varied to reflect fluctuations in the coupon issue yield equivalent from auction to auction over time pending completion of the appeal. The sponsor of this provision, added on the Senate floor as an amendment to the Federal Courts Improvement Act of 1982 (Pub L 97-164, tit III, part B, § 302, 96 US Stat 25, 55-56 [codified in part at 28 USC § 1961]), stated that “it would have the overall desirable effect of discouraging frivolous appeals in the Federal courts simply to gain the advantage of artificially low interest rates on judgments while judgments were tied up in courts for months or even years;” further, a formula pegged to the most recent sale of 52-week Treasury bills “which occur frequently throughout the course of the year more accurately reflect [s] prevailing money market conditions than the formula of section 6621 of the Internal Revenue Code” (127 Cong Rec 29865 [daily ed Dec. 8, 1981] [statement of Senator Grassley]). (At the time, 26 USC § 6621 based the interest rate for underpayment and overpayment of taxes on the prime interest rate; however, since 1986, the section 6621 rate has also been based on Treasury securities.) Since January 1, 1982, the coupon issue yield equivalent has varied from a high of 14.92% (Jan. 21, 1982) to a low of 3.13% (Sept. 17, 1992). The most recent auction of 52-week Treasury bills on June 1, 2000 produced a coupon issue yield equivalent of 6.375%. The “52-Week T-Bill Rate Table of Changes” is.found at 28 USC § 1961 (Historical and Statutory Notes, 2000 Pocket Part, at 95-98), and is kept up-to-date on several web sites maintained by Federal courts, e.g., http://www.nysd.uscourts.gov/pjrate.htm.